692 A.2d 76

DENNIS C. SMITH, PLAINTIFF–APPELLANT, v. BERNICE YOUNG AND LORRAINE BENJAMIN, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Submitted December 16, 1996—Decided April 23, 1997.

Brochin, J.A.D., dissented and filed opinion.

———

Before HAVEY, BROCHIN and KESTIN, JJ.

*Ravich, Koster, Tobin, Oleckna, Reitman & Greenstein,* attorneys for appellant (*Howard N. Wiener,* of counsel and on the brief).

*K. Ruth Larson,* attorney for respondents (*William D. Joachim,* on the brief).

The opinion of the court was delivered by

KESTIN, J.A.D.

This appeal represents yet another episode in the continuing saga of the development of sidewalk liability law in New Jersey. Plaintiff incurred serious injury when he slipped and fell on an accumulation of ice on a public sidewalk in front of defendants' property, a co-owned, two-family home in which only one of the co-owners resides, with the remaining residential unit rented to tenants by the other co-owner.

The trial court dismissed the complaint on defendants' motion for summary judgment, after classifying the property as residential, and holding as a result, in accordance with the prevailing rule, that defendants owed no legal duty to plaintiff to maintain the abutting sidewalk in a safe condition. If the trial court erred in its classification determination, *i.e.*, if the property in question is, as a matter of law, to be considered as commercial by reason of the fact that a portion of the premises is rented, the law imposes a duty on the owners to take reasonable steps to maintain abutting sidewalks.

I

In *Stewart v. 104 Wallace St., Inc.,* 87 *N.J.* 146, 157, 432 *A.*2d 881 (1981), the Supreme Court modified the previous rule of

"no liability", *see Yanhko v. Fane*, 70 *N.J.* 528, 362 *A.*2d 1 (1976), and held "that commercial landowners are responsible for maintaining in reasonably good condition the sidewalks abutting their property and are liable to pedestrians injured as a result of their negligent failure to do so." In *Mirza v. Filmore Corp.*, 92 *N.J.* 390, 456 *A.*2d 518 (1983), the duty was held to include removal or reduction of snow and ice as well as repair.

> We hold therefore that maintenance of a public sidewalk in a reasonably good condition may require removal of snow or ice or reduction of the risk, depending upon the circumstances. The test is whether a reasonably prudent person, who knows or should have known of the condition, would have within a reasonable period of time thereafter caused the public sidewalk to be in reasonably safe condition.
>
> [*Id.* at 395–96, 456 *A.*2d 518 (footnote omitted).]

A lessee in exclusive possession of commercial premises abutting the sidewalk is subject to the same duty, *Antenucci v. Mr. Nick's Mens Sportswear*, 212 *N.J.Super.* 124, 129–30, 514 *A.*2d 75 (App. Div.1986), but not to the extent of absolving the landlord from responsibility. *Vasquez v. Mansol Realty Assoc.*, 280 *N.J.Super.* 234, 237–38, 655 *A.*2d 82 (App.Div.1995). It is clear, however, that the duty does not extend to the owners of residential property. *Brown v. St. Venantius Sch.*, 111 *N.J.* 325, 327, 544 *A.*2d 842 (1988); *see also Liptak v. Frank*, 206 *N.J.Super.* 336, 338–39, 502 *A.*2d 1147 (App. Div.1985), *certif. denied*, 103 *N.J.* 471, 511 *A.*2d 652 (1986).

The Supreme Court in *Stewart* foresaw that problems would arise in close cases in determining whether a particular parcel of abutting real estate was commercial or residential. It ordained: "As for the determination of which properties will be covered by the rule we adopt today, commonly accepted definitions of 'commercial' and 'residential' property should apply, with difficult cases to be decided as they arise." 87 *N.J.* at 160, 432 *A.*2d 881. The Court specifically declared in a footnote that "apartment buildings would be 'commercial' properties covered by the rule." *Ibid.* Since *Stewart*, there has been a quest for a bright line approach that would serve to identify "commercial" properties covered by

the *Stewart/Mirza* rule and "residential" properties not subject to it.

In *Hambright v. Yglesias,* 200 *N.J.Super.* 392, 491 *A.2d* 768 (App.Div.1985), we held that a non-owner-occupied, two-family house was a commercial property for purposes of the *Stewart/Mirza* rule:

> [T]he court [in *Stewart* ] made it clear that it was the nature of the ownership that mattered, not the use to which the property is put. Apartment buildings are residential in the sense that they are places where people live; they are commercial in the sense that they are operated by their owners as a business. In the instant case, it is undisputed the property was owned and operated by defendant as a business venture. It was, therefore, a commercial property within the meaning of *Stewart* and *Mirza.* We express no opinion as to the result where a two-family house is partly owner-occupied.
>
> [*Id.* at 395, 491 *A.2d* 768 (footnote omitted).]

The Supreme Court's subsequent decision in *Brown v. St. Venantius School, supra,* 111 *N.J.* at 332–35, 544 *A.2d* 842, however, rested on an analysis that differed from our approach in *Hambright. See also id.* at 340–41, 544 *A.2d* 842 (Clifford, J., concurring); *id.* at 342–43, 544 *A.2d* 842 (Pollock, J., concurring). In *Brown,* the property was operated as a private parochial school by a not-for-profit religious corporation. The Court emphasized that the use of the property was critical. Beginning with the self-evident proposition that a school is not a residential use, the Court observed that, although there might be a question whether a not-for-profit private school should be considered to be a commercial use, a private school run for profit would clearly be commercial. The Court focused upon the nature of the use, emphasizing its non-residential character and holding that the owner's existence as a not-for-profit religious corporation had no bearing upon its duty under *Stewart/Mirza* when it was conducting an activity on the property that was not residential.

> [W]e see no reason why a nonprofit private school run by a charity should receive a greater benefit than any other private school as against the right of a plaintiff to recover for his or her injuries caused by the failure of the school to maintain properly its abutting sidewalk.
>
> [*Id.* at 338, 544 *A.2d* 842.]

Soon after *Brown*, a Law Division decision was based upon the proposition that "both the use made of the property and the nature of the ownership are factors to be considered in the analysis of whether or not property abutting a public sidewalk is commercial or residential." *Gilhooly v. Zeta Psi Fraternity*, 243 *N.J.Super.* 201, 206, 578 *A*.2d 1264 (Law Div.1990). A fraternity house at a college was seen as a hybrid, with residential qualities in respect of those members who lived there, and commercial qualities akin to a social club for members and alumni who did not. This determination was based, in part, upon the facts that all members of the fraternity—a nonprofit organization—paid dues used to fund social functions, and that those who resided at the house paid additional fees for room and board. The court went on to hold "that where property is partially commercial and partially non-commercial the former will take precedence in the application of the rule in *Stewart*." *Id.* at 205, 578 *A*.2d 1264.

In *Borges v. Hamed*, 247 *N.J.Super.* 353, 589 *A*.2d 199 (Law Div.1990), *aff'd o.b.*, 247 *N.J.Super.* 295, 589 *A*.2d 169 (App.Div. 1991), defendants occupied one residential unit in their three-family home. Relatives who paid rent resided in the other two units. In granting defendants' motion for summary judgment, the trial court judge relied, in part, upon an administrative regulation promulgated pursuant to the Consumer Fraud Act, *N.J.S.A.* 56:8–1 to –20. The regulation, *N.J.A.C.* 13:45A–16.1, defines "residential or non-commercial property" as

> a structure used, in whole or in substantial part, as a home or place of residence by any natural person, whether or not a single or multi-unit structure, and that part of the lot or site on which it is situated and which is devoted to the residential use of the structure, and includes all appurtenant structures.

The trial court judge went on to stress the Supreme Court's characterization of the property involved in *Brown:*

> "Clearly, defendant St. Venantius School, a private school, is not a residential property. *No one resides in the school.*" (emphasis added) [111 *N.J.* 325] at 332 [544 *A*.2d 842][.]

> [*Borges, supra*, 247 *N.J.Super.* at 357, 589 *A*.2d 199.],

and to observe:

> The *Stewart* case did not say that "residential" means only single family, owner-occupied homes and that everything else is commercial. If an owner lives in a

twenty-five unit apartment complex, that would not change the essential commercial character of the property. If, on the other hand, an owner occupied one unit of a two family house, and collected rent from the second unit, does that modest income change the essential character of the property from a residence to a commercial enterprise?

[*Id.* at 357 [589 *A.*2d 199] (citation omitted).]

The judge "rel[ied] heavily on the fact that defendants actually reside on the premises." *Ibid.* He held "that an owner-occupied three family house in a residential zone, with two rental units occupied solely by family members, is 'residential' property for purposes of applying the rule in *Stewart.*" *Id.* at 358. In affirming substantially for the reasons stated by the trial court judge, we held that the "vertical family compound cannot be considered a commercial property." 247 *N.J.Super.* at 296, 589 *A.*2d 169. We observed that the record did not disclose whether the rental charged by the owners to their relatives "yield[ed] a profit or merely cover[ed] the costs of owning and running the building," and "[w]e [did] not consider what should be the result if defendants lived in one apartment and rented the other two at market rates." *Ibid.*

*Avallone v. Mortimer,* 252 *N.J.Super.* 434, 599 *A.*2d 1304 (App. Div.1991), was based upon the factual premise that a portion of the owner-occupied house in question was leased as a residential apartment, perhaps seasonally. A footnote indicated that it was unclear "whether the portions of the premises available for lease were occupied at the time of the accident." *Id.* at 436 n. 1, 599 *A.*2d 1304. We opined that the treatment of hybrid uses in *Gilhooly* to accord precedence to the commercial use

partially misinterprets the *Brown* rationale. As we read *Brown,* its weighing of policy considerations was ultimately resolved entirely on the grounds that there simply was no residential use of the property, and that its charitable use was not crucial in balancing the interests of the injured party against that of the abutting owner except as to a beneficiary of the charity.

Thus, in the hybrid case here presented, it is necessary for us to address the issue expressly reserved in *Hambright* and *Borges:* what should be the result where the owner resides in a two- or three-family residence which abuts the sidewalk in question?

[*Id.* at 437, 599 *A.*2d 1304.]

We interpreted the underlying policy considerations of *Stewart* and *Brown* as embodying "a balancing approach which resulted in the Court's conclusion that commercial and other non-residential entities are more readily able to pass on to their users the added costs associated with sidewalk liability," and held that "[t]his rationale includes owners of apartment houses and of non-owner-occupied smaller residential buildings operated for revenue purposes." *Id.* at 438, 599 *A.*2d 1304. We applied the balancing approach by reversing the grant of summary judgment "to permit exploration of the predominance of use issue by motion or trial," *id.* at 439, 599 *A.*2d 1304, furnishing some "clear cut examples" to illustrate how, at the margins, the pertinent policy considerations might apply in the balance in particular cases to determine whether a use was "predominantly for the commercial benefit of the owner, and would fall within *Stewart* as interpreted in *Hambright*," or was "predominantly residential, ... thus fall[ing] within the exception recognized in *Stewart.*" *Id.* at 438, 599 *A.*2d 1304. We noted that in a particular case,

consideration of the factors of extent of income and extent of non-owner occupancy in terms of time and space, should enable a trial judge to determine whether the owner's residential occupancy preponderates. Where there are factual disputes respecting these factors, or where their weight is unclear, these will require resolution by a trier of fact.

[*Ibid.*]

The property involved in *Wasserman v. W.R. Grace & Co.*, 281 *N.J.Super.* 34, 656 *A.*2d 453 (App.Div.1995), was a four-bedroom house located in a residential neighborhood. We were called upon to consider whether the use of one bedroom to conduct the owner's business as a salesperson for his employer was sufficient to characterize the use as commercial for *Stewart/Mirza* purposes. Explicitly relying on *Avallone*, we once again applied the "predominance" or "primary function" test, and held that the use of a single room to assist the owner in performing his functions for a business located elsewhere "does not convert this property, whose primary function is residential, into a commercial property." *Id.* at 38, 656 *A.*2d 453. We observed:

> The determination of residential versus commercial status cannot be based upon profit alone, or else the status of the property would depend on the vagaries of the marketplace. In the circumstance of hybrid use, when the owner's occupancy, in terms of time or space, is greater than or equal to the rental occupancy, the property shall be considered residential regardless of whether the rental space generates a profit. *Avallone v. Mortimer,* 252 *N.J.Super.* 434, 437–38, 599 *A.*2d 1304 (App.Div.1991).
>
> Therefore, the determination of status should focus on use rather than profit.
>
> [*Id.* at 39, 656 *A.*2d 453.]

Finally among the cases exploring the meaning of *Stewart's* commercial/residential classification distinction, in *Abraham v. Gupta,* 281 *N.J.Super.* 81, 656 *A.*2d 850 (App.Div.), *certif. denied,* 142 *N.J.* 455, 663 *A.*2d 1362 (1995), the property at issue was a vacant lot zoned for commercial use. The property was not adjacent to or used in conjunction with a functioning commercial activity, as had been the case in *Stewart,* which also involved a vacant lot. We held the property not to be commercial in the *Stewart/Mirza* sense because "[i]t is the capacity to generate income which is the key." *Id.* at 85, 656 *A.*2d 850. We saw the contrary result in *Stewart* to have been ordained because, there, "the abutting sidewalk where the fall occurred was an integral part of a commercial enterprise" on an adjoining lot. *Id.* at 83, 656 *A.*2d 850. We observed that there are two bases upon which the *Stewart/Mirza* rule of liability for commercial uses is premised:

> In part, liability is imposed because of the benefits the entrepreneur derives from providing a safe and convenient access for its patrons. Secondly, such an enterprise has the capacity to spread the risk of loss arising from injuries on abutting sidewalks, either through the purchase of commercial liability policies or "through higher charges for the commercial enterprise's goods and services."
>
> [*Id.* at 85, 656 *A.*2d 850 (quoting *Mirza, supra,* 92 *N.J.* at 397, 456 *A.*2d 518).]

We reasoned and held as follows:

> These policy considerations simply do not apply to defendant's vacant commercial lot. The lot is not owned by or used as part of a contiguous commercial enterprise or business. There is no daily business activity on the lot to which a safe and convenient access is essential. The lot has no means of generating income to purchase liability insurance or to spread the risk of loss by the increase in cost of goods sold or services rendered. Simply because it is designated "commercial" by the City's zoning ordinance is an insufficient basis to impose the *Stewart* liability rule upon its owner.

[*Id.* at 85–86, 656 *A.*2d 850.]

## II

Lest *Avallone, Wasserman,* and even our opinion in *Borges,* be seen as embracing a counting process for determining whether a property is predominantly commercial or predominantly residential, we hasten to observe that arithmetic formulas are poor vehicles for applying rules of law that are based on policy considerations. The focus must be on the qualities of the use, not upon quantity. We suggested as much in endorsing the trial court judge's emphasis in *Borges* upon the essential character of the property. If, in *Wasserman,* the property owner's employer had actually located its business in the one room of his house, as distinguished from the owner's use of the room as a home office, the result might have been different. Certainly, the balance of factors and interests would have been affected.

The decisional bases of *Borges, Avallone,* and *Abraham* were fact specific, each differing from the others. In *Borges,* we regarded the actual use and essential character of the property to be controlling. Because the record did not disclose whether the rental of two flats to family members "yield[ed] a profit or merely cover[ed] the costs of owning and running the building," and because, without specific proof to the contrary a "vertical family compound cannot be considered a commercial property," we held the owners to be exempt from the duty imposed on commercial landowners, without "consider[ing] what should be the result if defendant lived in one apartment and rented the other two at market rates." 247 *N.J.Super.* at 296, 589 *A.*2d 169.

In *Avallone,* we remanded for factual exploration of the "predominance of use issue," 252 *N.J.Super.* at 439, 599 *A.*2d 1304, in light of the "considerations of balance and ability to pass along cost" that flavored *Stewart* and *Brown. Id.* at 438, 599 *A.*2d 1304. We did note, however, that resolution of the issue—whether the property was maintained predominantly for the commercial benefit of the owner—might be as much a matter of degree as

substance, *i.e.*, the extent to which the income generated offset the carrying costs of the property. *Ibid.*

In *Abraham*, the emphasis was on present value and current use. In the absence of ongoing business activity to which safe and convenient access was essential, and any existing ability to spread the risk of loss, we saw the underlying rationale of *Stewart* to require that the property owner be held not to be liable. The classification of the property as commercial for land use purposes was seen to have no bearing.

### III

The quest for definition reveals how unedifying the *Stewart/Mirza* commercial-residential classification distinction is. *See Brown, supra,* 111 *N.J.* at 339–341, 544 *A.*2d 842 (Clifford, J., concurring) and *id.* at 341–44, 544 *A.*2d 842 (Pollock, J., concurring). And, ever more exotic hybrids of ownership and use, such as this case involves, point up the futility of the pursuit.

Analysis of the cases decided since *Stewart* and *Mirza* discloses that the commercial-residential distinction is not workable because too many variables are at play. There are non-residential uses that are not commercial in character as that term is commonly understood, *see Brown, supra,* 111 *N.J.* at 332–34, 544 *A.*2d 842, and commercial properties that are seen not to embody qualities generally associated with business holdings, *see Abraham, supra,* 281 *N.J.Super.* at 85–86, 656 *A.*2d 850. Yet, to speak, instead, only of residential and non-residential uses would tend to under-value the fact that some residential uses, such as apartment houses, are distinctly income producing in character and, therefore, at least in one sense of the term, commercial or business properties. *See Stewart, supra,* 87 *N.J.* at 160 n. 7, 432 *A.*2d 881. Further, although some nominally commercial uses cannot realistically be regarded as having truly commercial characteristics, *see Abraham, supra,* 281 *N.J.Super.* at 85–86, 656 *A.*2d 850, there exist other, non-commercial uses which have been labelled commercial because they mimicked commercial enterprises, *see*

*Brown, supra,* 111 *N.J.* at 332–34, 544 *A.2d* 842; *Gilhooly, supra,* 243 *N.J.Super.* at 207, 578 *A.2d* 1264, or because of the potential for realizing some net return after paying the expenses of upkeep, *see Hambright, supra,* 200 *N.J.Super.* at 395, 491 *A.2d* 768, even if only from a single tenant, *see Avallone, supra,* 252 *N.J.Super.* at 438–39, 599 *A.2d* 1304. Along the lines of economic benefit, no case has yet reflected upon the extent to which, if at all, the investment value of a particular tract may bear upon the classification determination.

As we have previously observed, the rationale upon which the *Stewart/Mirza* rule is based may have less to do with the character of the use to which the property is put, or even specifically whether the owner makes a profit, than it does with whether the owner has a fair opportunity to spread the costs of liability. *See Avallone, supra,* 252 *N.J.Super.* at 438, 599 *A.2d* 1304; *Abraham, supra,* 281 *N.J.Super.* at 85, 656 *A.2d* 850. *But see Bligen v. Jersey City Housing Auth.,* 131 *N.J.* 124, 136, 619 *A.2d* 575 (1993) (regarding as insignificant some practical limitations on the property owner's ability to spread the costs). In general, commercial enterprises, including those devoted to residential uses such as apartment houses, can efficiently spread the costs of liability among those who pay for the facilities provided, such as customers and tenants. In non-multiple-dwelling housing situations, however, the opportunities for cost-spreading are minimal or non-existent. Sometimes there is no cost-spreading opportunity at all; only the possibility of assigning the cost from the non-residential owner to a single tenant of rental premises, as, for example, in the rental of a one-family home or, as here, in the rental of one flat in an owner-occupied, two-family home in the peculiar circumstances depicted.

In *Hambright,* which involved a non-owner-occupied, two-family home, we held the ownership to be commercial; the cost could be "spread," however minimally, between the two tenants. Yet in *Borges,* where the cost could also be spread between two tenants,

we held the property to be essentially residential because the owners lived in a third unit and the tenants were related to them.

*Gilhooly* can be read as fully comporting with the cost-spreading rationale, however. Although a major aspect of the fraternity house's use was residential, a number of tenants or residents were involved. When coupled with another use to which the property was put, that of a social club, the cost-spreading potential was enlarged. Despite the *Gilhooly* court's characterization of the latter use as commercial, there was apparently no evidence that it was intended to generate profit, a purpose that would have been at variance with the not-for-profit status of the owning entity. Further, as *Brown* teaches, the not-for-profit status of the owner has no bearing upon the classification determination. 111 *N.J.* at 338, 544 *A.*2d 842.

Our experience with the classification problem suggests that the holding in *Stewart* is a rule in search of a definition. More significantly, the basic premise from which it proceeds is unknown. Does the *Stewart/Mirza* rule establish a commercial exception to the "no liability" rule of *Yanhko,* or does it create a new liability rule for all property except that which is residential? Under the first approach, a property owner is not liable unless it is established that the property is commercial. *Borges, Avallone,* and *Abraham* may be seen as examples. Under the second approach, the property owner is held liable if it cannot be established that the property is residential. *Brown* and *Hambright* may be regarded as examples. What elements of proof a rule entails and who is to bear the burden are important considerations that ought not to depend upon vagaries of fact on a case by case basis.

The *Stewart/Mirza* rule also creates significant ancillary problems, apart from those of direct interpretation and application. For example, if a property owner who resides in a two- or three-family home and rents the other flat or flats at market rates, is considered, as a matter of law, to be engaged in a commercial use, it may be that the owner will experience difficulty in obtaining coverage under a homeowner's insurance policy which contains a

business pursuits exclusion, notwithstanding that the property is used only for residential purposes. *See Wickner v. American Reliance Ins. Co.*, 141 *N.J.* 392, 399–401, 661 *A.*2d 1256 (1995).

Other anomalies exist, as well. The Supreme Court's *Yanhko v. Fane* "reject[ion of] the thesis that a municipal sidewalk ordinance creates a tort duty owing to passersby on the public passageway," 70 *N.J.* at 536, 362 *A.*2d 1, perpetuated a particularized limitation on a venerable rule of law that permits an injured plaintiff to use violation of a legislatively established standard "as evidence of negligence for the consideration of the jury," *Fortugno Realty Co. v. Schiavone–Bonomo Corp.*, 39 *N.J.* 382, 392, 189 *A.*2d 7 (1963), as long as the plaintiff was "one of a class for whose benefit the statute was enacted." *Id.* at 391, 189 *A.*2d 7. *See also Carlo v. Okonite–Callender Cable Co.*, 3 *N.J.* 253, 264, 69 *A.*2d 734 (1949); *Evers v. Davis*, 86 *N.J.L.* 196, 204–05, 90 *A.* 677 (Err. & App. 1914). A few years after *Yanhko*, however, in *Carrino v. Novotny*, 78 *N.J.* 355, 396 *A.*2d 561 (1979), dealing with the effect of a municipal ordinance, the Supreme Court revitalized the general rule, which has since been recognized and applied in a variety of circumstances, most recently in *Williamson v. Waldman*, 291 *N.J.Super.* 600, 607, 677 *A.*2d 1179 (App.Div.), *certif. granted*, 147 *N.J.* 259, 686 *A.*2d 761 (1996), and *Hoagland v. Gomez*, 290 *N.J.Super.* 550, 554, 676 *A.*2d 187 (App.Div.1996). *See also Waterson v. General Motors Corp.*, 111 *N.J.* 238, 263, 544 *A.*2d 357 (1988).

It remains beyond peradventure "that municipal ordinances do not create a tort duty, as a matter of law." *Brown, supra,* 111 *N.J.* at 335, 544 *A.*2d 842. To hold that they do would be to misapply the general rule employed in *Carrino.* For example, a plaintiff's cause of action cannot be based upon the specific duty to remove snow and ice imposed by municipal ordinance enacted pursuant to the statute which empowers municipalities to require landowners or tenants "to remove all snow and ice ... within twelve hours of daylight." *N.J.S.A.* 40:65–12. Rather, such a claim must be premised upon the classic general

duty of a possessor of land to make only reasonable uses of his property, "so as to cause no unreasonable risks of harm to others in the vicinity." *Prosser on Torts*, § 57 at 386 (5th ed. 1984). Since this general duty extends even to persons outside the premises, *ibid.*, it may be taken to apply, as well, to persons on those portions of the property over which there is a public easement. Applying the statutory snow and ice removal standard in the limited manner employed in *Carrino* merely provides a plaintiff with a basis for establishing that the failure to remove snow and ice was unreasonable in the circumstances established and, therefore, negligent. *See also Liptak, supra,* 206 *N.J.Super.* 336, 502 *A.*2d 1147.

Where a case arises in a municipality which has adopted an ordinance pursuant to *N.J.S.A.* 40:65–12, a properly situated plaintiff, *see Hoagland, supra,* 290 *N.J.Super.* at 553–54, 676 *A.*2d 187, ought to have the benefit of the general rule of tort law that permits him or her to use the statutory standard as a basis for persuading the finder of fact that the defendant acted unreasonably in the circumstances. The Supreme Court's articulation in its most recent case involving sidewalk liability, *Brown, supra,* 111 *N.J.* 325, 544 *A.*2d 842, may be taken to embody this idea. *Brown*'s emphatic exclusion of a rule-of-law approach, *id.* at 335, 544 *A.*2d 842, seems also to suggest that the evidence-of-negligence methodology may be appropriate.

As we focus on the classification problem, we must be mindful of the Supreme Court's observation in *Mirza, supra,* 92 *N.J.* 390, 395, 456 *A.*2d 518:

> In many respects, the duty to remove snow and ice is more important and less onerous than the general duty of maintenance imposed in *Stewart.* Snow and ice pose a much more common hazard than dilapidated sidewalks. The many innocent plaintiffs that suffer injury because of unreasonable accumulations should not be left without recourse. *See Stewart,* [*supra,*] 87 *N.J.* at 155, 157 [432 *A.*2d 881]. Ordinary snow removal is less expensive and more easily accomplished than extensive sidewalk repair.

It may well be, in terms of the policy considerations that inform rules of law defining tort rights and duties, that the subject matter area of sidewalk liability, as addressed to date, too broadly merges

conceptions that are very different and ought to be separately dealt with. In matters involving snow and ice, especially, it may be well to consider applying the time-tested general rule so aptly employed in *Carrino.*

Justices Clifford and Pollock, although disagreeing on the basic issue of sidewalk liability, have expressed similar views on the unwisdom and inutility of treating residential property owners differently from the owners of commercial property in this regard. *Brown, supra,* 111 *N.J.* at 340–41, 544 *A.2d* 842 (Clifford, J. concurring); *id.* at 342–43, 544 *A.2d* 842 (Pollock, J. concurring). Our experiences since *Stewart/Mirza* with the problems of classifying particular uses are testimony to their prescience.

Finally, although the principles we have applied from time to time in the classification cases that have come before us since *Stewart/Mirza* have worked to resolve the issues presented in each case, all were crafted to deal with the facts of each case. None applies neatly to the facts of this matter, or to any other case with different facts. A principle that cannot be applied to more than a single case is more like a tautology than a rule of law.

## IV

Here, the property is a co-owned, two-family home, unquestionably residential in use. One of the co-owners, defendant Young, occupies the first floor, and has been living on the property for more than twenty-five years. She considers herself the owner of that portion of the property in which she resides. The co-owner of the remaining interest in the property is the estate of Ms. Young's sister, defendant Lorraine Benjamin, who died before plaintiff's injuries occurred, and who lived on the second floor before her death. At the time plaintiff's injuries occurred, the estate's co-ownership interest in the property was managed by Deborah Benjamin, Lorraine's daughter, an Ohio resident. Deborah Benjamin rented out the second floor to tenants and collected the rent on behalf of the estate. The record does not disclose the amount of rental that was paid or the costs of upkeep for the

property.  Ms. Young had undertaken to see to matters involving maintenance and repair of the property, including hiring a handyman to clear the sidewalk of snow and ice.  General costs of maintenance and repair were divided between the co-owners.

The property at issue is distinctly residential in the common understanding of that term.  Just as the activities of the private school in *Brown* had no residential characteristics, the uses here have no real commercial qualities.  We may choose to label rental of a single flat, presumably at market rates, as commercial for *Stewart/Mirza* classification purposes, but doing so does not transform the activity, as a matter of fact, into a business.  Even if we were to remand, as we did in *Avallone*, for findings whether the rental income exceeds the carrying costs of the property—an artificial determinant at best—the essentially residential nature of the use would remain unchanged.  And how, in the peculiar facts of this case, would the calculation be made?  Would the rental income of the tenanted flat be balanced against the whole of the carrying costs even though half of those costs are borne by a residing owner who receives none of the rental income?  Is only half of the rental income to be balanced against the half of the carrying charges borne by the owner who receives all of the rent?  Would either approach, or any other, be a real basis of decision, or would it be one artificially created to deal with the apparent equities of the particular situation in the light of a dictated need to classify the property?  These are only some of the questions raised by the special facts of this case.  We resist articulating an approach, as we have done in the past, good for one case and that case only.

Further, although the result reached in *Avallone*—a remand for factual exploration of the predominance of use issue—seems attractive, it would only transfer the responsibility for dealing with an intractable problem, which is especially difficult on the facts of this case, to the trial court and the parties.  And it would sponsor an arithmetic approach to such problems which we regard as inappropriate.

Nevertheless, *Stewart* requires that the property be classified. *Stewart* itself provides a beginning point: "For example, apartment buildings would be 'commercial' properties covered by the rule." 87 *N.J.* at 160 n. 7, 432 *A.*2d 881. Yet, if the term "apartment house" is understood strictly, as previously defined in case law, it would apply to every dwelling of two or more stories.

> An apartment house has been defined as a building consisting of more than one story, designed so that on each floor there are one or more suites of rooms fitted for housekeeping purposes, including a kitchen or kitchenette in each housekeeping unit. *Lignot v. Jaekle*, 72 *N.J. Eq.* 233, [238–41, 65 *A.* 221] (Ch.1906).
>
> [*Schermer v. Fremar Corp.*, 36 *N.J.Super.* 46, 52, 114 *A.*2d 757 (Ch.Div.1955).]

*See also Koch v. Gorruflo*, 77 *N.J. Eq.* 172, 174, 75 *A.* 767 (Ch.1910); *Skillman v. Smathehurst*, 57 *N.J. Eq.* 1, 4–7, 40 *A.* 855 (Ch. 1898).

It is clear that the Supreme Court did not intend so broad a focus. Rather, its reference to "apartment house" seems to be in keeping with common usage, connoting a multiple-family dwelling which is owned for the purpose of providing a net monetary return. We must also accord adequate emphasis to the Court's cost-spreading rationale and its concentration on the costs of doing business:

> We recognize that the rule adopted today will increase the expenses of many businesses, and will be proportionately more burdensome to small firms than to large ones. However, we anticipate that appropriate insurance will become available and that the cost of such insurance will be treated as one of the necessary costs of doing business.
>
> [*Stewart, supra*, 87 *N.J.* at 160, 432 *A.*2d 881.]

Further, we must give full effect to the Court's reliance on common understandings when it declared:

> As for the determination of which properties will be covered by the rule we adopt today, commonly accepted definitions of "commercial" and "residential" property should apply, with difficult cases to be decided as they arise.
>
> [*Ibid.*]

With these perceptions in mind, and with the benefit of hindsight regarding the fruitless search for portable classification criteria, we now conclude that, while the Supreme Court may have intended to include property solely held for investment purposes within the *Stewart* rationale, it had no intention to subsume small

owner-occupied dwellings, such as two-or three-family homes, within the classification of commercial property. Such uses are clearly in a category of their own, for they are residential both "in the nature of their ownership" as well as in "the use to which the property is put." *Hambright, supra,* 200 *N.J.Super.* at 395, 491 *A.*2d 768. The property at issue here, being an owner-occupied, two-family home is clearly within the exempted category, absolving the owners from the duty to maintain abutting sidewalks under currently prevailing standards.

We are aware that this holding does nothing to resolve the classification issues regarding all non-owner-occupied properties and those that are owner-occupied but accommodate more than two or three families. The lingering difficulties that the currently prevailing rule imposes will persist as long as courts are required to classify properties according to the existing commercial/residential dichotomy.

Affirmed.

BROCHIN, J.A.D., (dissenting).

Since I am unable to perceive any current justification for the rule insulating owners of purely residential property from liability for injuries resulting from their negligent failure to clear ice and snow from abutting sidewalks, I would restrict our application of that rule to the narrowest possible compass consistent with the deference which we owe to decisions of our Supreme Court. In my view, those decisions require no more of us than to hold that the owner of property which is used solely as the owner's own residence is exculpated from liability. I do not believe that we are obligated to extend that exculpatory rule to an owner of property which produces any significant amount of income. To the extent that decisions of our court may suggest a contrary result, I would not follow them. Accordingly, I would not extend the exculpatory rule to this case. I would therefore reverse the judgment appealed from and remand the case for trial.