998 A.2d 506

RICHARD LUCHEJKO, PLAINTIFF–APPELLANT, v. CITY OF HO-BOKEN, CM3 MANAGEMENT COMPANY AND SKYLINE CONDOMINIUM ASSOCIATION, DEFENDANTS–RESPONDENTS, AND D & D SNOW PLOWING COMPANY, DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued October 5, 2009—Decided July 12, 2010.

Before Judges RODRÍGUEZ, YANNOTTI and CHAMBERS.

*Denise Campbell*, argued the cause for appellant (*Campbell Legal Associates, P.L.L.C.,* attorneys; *Ms. Campbell*, on the brief).

*Robert C. Neff, Jr.,* argued the cause for respondent Skyline Condominium Association (*Wilson, Elser, Moskowitz, Edelman & Dicker,* attorneys; *Mr. Neff,* of counsel and on the brief).

*Nita G. Raval*, argued the cause for respondent City of Hoboken (*Florio & Kenny,* attorneys; *Ms. Raval,* of counsel; *Christopher K. Harriott,* on the brief).

The opinion of the court was delivered by

RODRÍGUEZ, A.A., P.J.A.D.

The principal, novel issue presented in this appeal is whether for sidewalk liability purposes, a condominium association has a duty to maintain an abutting public sidewalk as if it were a commercial landowner. We hold that a condominium association does not bear such duty or responsibility. We also reject other theories of liability against the association and Hoboken.

Plaintiff Richard Luchejko appeals from an order granting summary judgment to defendants City of Hoboken, Skyline Condominium Association (Skyline) and CM3 Management Company (CM3). He also appeals from an order denying his motion for reconsideration. We affirm.

These facts are uncontradicted. At 6:45 a.m. on February 14, 2006, Luchejko slipped and fell on ice on a public sidewalk

abutting a building at 551 Observer Highway in Hoboken, which is a 104 unit condominium complex. Skyline is the entity responsible for maintaining the common elements of the building, including the adjacent sidewalks. Skyline contracted with CM3 to manage the property. In turn, CM3 hired D & D Snow Plowing Company (D & D) to provide snow plowing services, including the service of all sidewalks surrounding the building. According to Luchejko, at the time that he fell, a sheet of black ice covered most of the sidewalk. A pile of snow reached up over the curb and partially onto the sidewalk.

Luchejko sued Hoboken, Skyline and CM3. Subsequently, he filed an amended complaint adding D & D as a defendant. All parties filed timely answers. After a period of discovery, Skyline, CM3 and Hoboken moved for summary judgment. Luchejko opposed the motions. All summary judgment motions were heard at the same time.

The record considered by the judge included the depositions of several witnesses. Their testimony was largely uncontradicted. John Schmidt, Skyline's Board President, testified that the sole purpose of Skyline is to operate the premises as a residential building. All of the condominium units are individually owned in fee simple and the premises are operated solely for use by the residents. There is no retail space located on the premises and no profit is generated from any of Skyline's activities. Accordingly, Skyline is organized as a non-profit corporation pursuant to *N.J.S.A.* 15A:1–1. None of the members or officers receive compensation for their services. Skyline hired defendant CM3 as the property manager of the building to perform financial services, hire personnel and solicit bids from outside contractors.

James Buckley, owner of CM3, testified that he first found out about the accident from the doorman of the complex, Abdiel Pino. Pino arrived on the scene after the accident occurred. Pino informed him over the telephone that he had put down salt following Luchejko's accident. CM3 hired D & D to provide snow plowing services, including the service of all public sidewalks

surrounding the building. D & D would automatically perform snow plowing services when there was more than two inches of snow fall or there was an ice storm. Buckley never discussed the accident with anyone from D & D.

Jose Perez, owner of D & D, testified that on February 11, 2006, three days before Luchejko's fall, it began snowing around 7:00 p.m. Approximately twenty-seven inches of snow fell during the storm. D & D first serviced the property from 1:00 a.m. to 2:00 a.m. on February 12, 2006. D & D returned to service the property that same day from 5:00 a.m. to 6:00 a.m., 10:00 a.m. to 11:00 a.m., 1:00 p.m. to 2:00 p.m. and finally from 4:00 p.m. to 5:00 p.m. Following the last clean up by D & D, it did not snow again prior to Luchejko's fall on the morning of February 14, 2006. According to Perez, it was his regular practice to visit a serviced site the following day. In this case, he did that on his follow-up visit on February 13, 2006. The sidewalks and curb were clear at that time.

James Ronga, a program monitor for Hoboken, had various responsibilities within the Environmental Services Department, such as supervisor of the sanitation inspectors, which included responsibility over sidewalks. Ronga testified that as far back as 2002, there had been no complaints filed in regard to the clearing of the sidewalks surrounding Skyline after a snowfall. No violations had been issued to Skyline or its agents for failure to comply with the snow removal code. Ronga described Hoboken's policy for snow removal as being "roughly six hours after the last snow stops." A limited number of inspectors are required to inspect the main streets of the town immediately. In addition, Ronga's unit also responds to telephone complaints.

Hoboken City ordinance § 168–8(A) provides:

> The owner or occupant or person having charge of any dwelling house, store or other building or lot of ground in the city shall, within the first (6) hours after every fall of snow or hail, or after the formation of any ice upon the sidewalks, unless the ice is covered with sand or ashes, cause the snow and ice to be removed from the sidewalk abutting such dwelling house, store, building or lot of land and

piled not more than eighteen (18) inches from the curb line into the public street or road.
[Hoboken City ordinance § 168–8(A)].

Hoboken Police Officer John Orrico testified that when he first arrived at the scene, Luchejko was lying on the ground complaining of pain. The portion of the sidewalk where Luchejko fell was icy. Orrico noted in his police report that Luchejko sustained injury to his left ankle and leg. Orrico did not issue a summons because it would have been a Hoboken inspector's decision.

Judge Barbara A. Curran granted summary judgment to Hoboken, Skyline and CM3. D & D's motion for summary judgment was denied. Luchejko moved for reconsideration. The judge denied Luchejko's motion for reconsideration. Eventually, Luchejko and D & D settled the remaining claim.

Luchejko appeals contending that the judge erred by: (1) concluding that Skyline is not a commercial entity for the purpose of sidewalk liability; (2) applying immunity provisions to Hoboken's failure to adhere to its own policies and procedures regarding sidewalk inspections after a snow fall; (3) concluding that the inaction of Hoboken was not palpably unreasonable; and (4) failing "to consider the fact that Skyline and CM3 assumed the duty to maintain the sidewalk in question and were obligated to do so in accordance with the Hoboken code." We are not persuaded by any of these arguments.

When the grant of summary judgment is under review, we must apply the same standard as the trial court to the same motion record. *Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A.*, 189 *N.J.* 436, 445–46, 916 *A.*2d 440 (2007); *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 536, 666 *A.*2d 146 (1995). *Rule* 4:46–2(c) provides that a court should grant summary judgment when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Therefore, we must first decide whether there is a genuine

issue of fact. *Prudential Prop. & Cas. Ins. Co. v. Boylan*, 307 *N.J.Super.* 162, 167, 704 *A.*2d 597 (App.Div), *certif. denied*, 154 *N.J.* 608, 713 *A.*2d 499 (1998). "An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences there from favoring the non-moving party, would require submission of the issue to the trier of fact." *R.* 4:46–2(c); *Brill, supra*, 142 *N.J.* at 540, 666 *A.*2d 146. Second, if there is no genuine issue of fact, we must decide whether the party seeking summary judgment is entitled to it as a matter of law. *Boylan, supra*, 307 *N.J.Super.* at 169–70, 704 *A.*2d 597.

### Commercial Entity Argument

Luchejko contends that Skyline is a commercial entity for the purposes of sidewalk liability. We disagree.

The old rule, upheld most recently in *Yanhko v. Fane*, 70 *N.J.* 528, 362 *A.*2d 1 (1976), that all property owners abutting a sidewalk were immune from liability, was partially overruled in *Stewart v. 104 Wallace St., Inc.*, 87 *N.J.* 146, 149, 432 *A.*2d 881 (1981). In overruling *Yanhko*, the Supreme Court held that "a plaintiff has a cause of action against a commercial property owner for injuries sustained on a deteriorated sidewalk abutting that commercial property when that owner negligently fails to maintain the sidewalk in reasonably good condition." *Ibid.*

This holding was based on the premise that imposing a duty to maintain sidewalks on commercial owners was particularly compelling. *Id.* at 157–59, 432 *A.*2d 881. In so finding, the Court noted:

[f]or the protection of its patrons, every commercial establishment must maintain its premises, including means of ingress and egress, in reasonably safe condition. And although the paved sidewalks fronting a commercial establishment are primarily for the use of the public generally, their condition is so beneficially related to the operation of the business that the unrestricted legal duty of maintaining them in good repair might, arguably, be placed on it.

[*Id.* at 159, 432 *A.*2d 881.]

As for determining which properties were to be covered by the new rule, the Court held that "commonly accepted definitions of

commercial and residential property should apply, with difficult cases to be decided as they arise." *Id.* at 160, 432 *A.*2d 881. Apartment complexes were characterized as "commercial" properties and thus *Stewart* liability applies. *Id.* at 160 n. 7, 432 *A.*2d 881.

The holding in *Stewart, supra,* 87 *N.J.* at 149, 432 *A.*2d 881, was subsequently extended to include commercial landowners who unreasonably fail to remove snow and ice from the abutting sidewalk after actual or constructive notice. *Mirza v. Filmore Corp.,* 92 *N.J.* 390, 395–96, 456 *A.*2d 518 (1983). Moreover, we have addressed whether a property is commercial or residential for purposes of sidewalk liability since the decision in *Stewart, supra,* 87 *N.J.* at 149, 432 *A.*2d 881. For instance, in *Abraham v. Gupta,* 281 *N.J.Super.* 81, 85, 656 *A.*2d 850 (App.Div.), *certif. denied,* 142 *N.J.* 455, 663 *A.*2d 1362 (1995), we summarized the manner in which courts should decide this issue:

> [L]iability is imposed upon the owner of a profit, or not-for-profit enterprise, regardless of whether the enterprise is in fact profitable. It is the *capacity to generate income* which is the key. In part, liability is imposed because of the *benefits the entrepreneur derives* from providing a safe and convenient access for its patrons. Secondly, such an enterprise has the *capacity to spread the risk of loss* arising from injuries on abutting sidewalks, either through the purchase of commercial liability policies or "through higher charges for the commercial enterprise's goods and services." [*Ibid.* (quoting *Mirza, supra,* 92 *N.J.* at 397, 456 *A.*2d 518) (emphasis added).]

Thus, if the property is owned for investment or business purposes, the property is classified as commercial and public sidewalk liability applies. *Dupree v. City of Clifton,* 351 *N.J.Super.* 237, 242, 798 *A.*2d 105 (App.Div.2002), *aff'd o.b.,* 175 *N.J.* 449, 815 *A.*2d 960 (2003). Such is the case where the property was a non-owner-occupied two-family house that was leased to separate tenants. *Hambright v. Yglesias,* 200 *N.J.Super.* 392, 395, 491 *A.*2d 768 (App.Div.1985). In extending liability, the court in *Hambright* specifically noted that the Supreme Court "made it clear that it was the nature of the ownership that mattered, not the use to which the property is put." *Ibid.*

Further, in *Brown v. St. Venantius School,* 111 *N.J.* 325, 544 *A.*2d 842 (1988), the Court held that a parochial school was commercial for purposes of sidewalk liability. *Id.* at 338, 544 *A.*2d 842. The Law Division likewise extended sidewalk liability to a fraternity house because it was used not only as a residence for college students, but also as a social club for members and alumni who did not reside on the premises. *Gilhooly v. Zeta Psi Fraternity,* 243 *N.J.Super.* 201, 207–08, 578 *A.*2d 1264 (Law Div.1990). Relying on *Brown, supra,* 111 *N.J.* at 338, 544 *A.*2d 842, the Law Division concluded that "where property is partially commercial and partially noncommercial[,] the former will take precedence in the application of the rule in *Stewart.*" *Gilhooly, supra,* 243 *N.J.Super.* at 205, 578 *A.*2d 1264.

However, in *Avallone v. Mortimer,* 252 *N.J.Super.* 434, 437, 599 *A.*2d 1304 (App.Div.1991), we concluded that "the *Gilhooly* approach to hybrid residential/non-residential properties partially misinterpreted the *Brown* rationale," stating:

> [a]s we read *Brown,* its weighing of policy considerations was ultimately resolved entirely on the grounds that there simply was no residential use of the property, and that its charitable use was not crucial in balancing the interests of the injured party against that of the abutting owner except as to a beneficiary of the charity. [*Ibid.*]

The property there was characterized as a hybrid property because the owner resided in his multi-family residence, although a portion of the residence was leased as a residential apartment. *Id.* at 435–36, 599 *A.*2d 1304. In determining how to characterize the property, we relied on the balancing approach found in the policy considerations set forth in *Stewart, supra,* 87 *N.J.* at 154–57, 432 *A.*2d 881, and *Brown, supra,* 111 *N.J.* at 332–35, 544 *A.*2d 842, resulting in our conclusion that:

> [c]ommercial and other non-residential entities are more readily able to pass on to their users the added costs associated with sidewalk liability. This rationale includes owners of apartment houses and of non-owner-occupied smaller residential buildings operated for revenue purposes. [*Id.* at 437–38, 599 *A.*2d 1304.]

We then held "that the same applicable considerations of balance and ability to pass along cost require that the residential sidewalk

exception be continued for owner-occupants whose residency is established to be the predominant use." *Id.* at 438, 599 *A.*2d 1304.

Accordingly, *Stewart* liability was not imposed where the owners resided in one apartment within their three-family residence and other family members resided in the other two apartments despite the owners receiving rent. *Borges v. Hamed,* 247 *N.J.Super.* 295, 296, 589 *A.*2d 169 (App.Div.1991). Likewise, in *Smith v. Young,* 300 *N.J.Super.* 82, 84, 692 *A.*2d 76 (App.Div.1997), the property was co-owned by two parties, one of which resided in one of the apartments. The second apartment was rented to a tenant. *Ibid.* We did not extend *Stewart* liability because one owner resided on the premises. *Id.* at 99–100, 692 *A.*2d 76.

Therefore, a property will not be considered commercial if it is predominantly owner-occupied. *Avallone, supra,* 252 *N.J.Super.* at 438, 599 *A.*2d 1304. In making such a determination, a court must balance the nature of ownership as well as the ability to pass along the cost of liability. *Ibid.* It is not the use to which the property is put that is determinative, but rather the nature of the ownership. *Hambright, supra,* 200 *N.J.Super.* at 395, 491 *A.*2d 768. In balancing the relevant factors, the key issue in determining whether a property is commercial is its "capacity to generate income." *Abraham, supra,* 281 *N.J.Super.* at 85, 656 *A.*2d 850. Pursuant to *Dupree v. City of Clifton,* 351 *N.J.Super.* 237, 798 *A.*2d 105 (App.Div.2002), *aff'd* 175 *N.J.* 449, 815 *A.*2d 960 (2003), when considering the rule governing non-profits, we looked at the use of the property. Here, under the *Dupree* analysis applicable to non-profits, the use is strictly residential and thus, the law governing residential property applies. *Brown* was distinguished on the basis that the church in that case operated a private school on its premises.

Here, Skyline is a non-profit corporation and its members are the present unit owners within the Skyline complex. Only owners are permitted to be members. The owners are permitted to lease their individual units, subject to the covenants and restrictions contained in the deed and by-laws. Although fees are

collected from the members, the funds collected are used solely for the upkeep of the property, with no profit realized. This is different from a rental apartment building, which is considered commercial due to the owner's capacity to generate income from the property. *Stewart, supra,* 87 *N.J.* at 160 n. 7, 432 *A.*2d 881. Further, those persons who hold trustee positions within Skyline do not earn an income for their participation and thus there is no benefit derived. *See Abraham, supra,* 281 *N.J.Super.* at 85, 656 *A.*2d 850.

Skyline does, however, have the capacity to spread the risk of loss arising from injuries on abutting sidewalks but not in the way in which the courts have suggested "through higher charges for the commercial enterprise's goods and services." *Mirza, supra,* 92 *N.J.* at 397, 456 *A.*2d 518. Skyline does not provide the public with goods and services and therefore can not increase charges to accommodate such liability.

According to Skyline's by-laws, it is "to maintain public liability insurance insuring [Skyline] and its members against any claims arising from injuries or damages occurring on the common elements and facilities. . . ." Its walkways and internal sidewalks are listed as common elements within the master deed. However, Luchejko fell in a public sidewalk on Monroe Street abutting the building's property. The sidewalk is thus not within the Skyline complex and would not be considered a common element to be covered by the insurance policy. For these reasons, although there are many owners in which to spread the cost of liability, the cost would be personal to each owner, which is not in accordance with noted policy considerations outlined.

Finally, a property should not be considered commercial if it is predominantly owner-occupied. *Avallone, supra,* 252 *N.J.Super.* at 438, 599 *A.*2d 1304. Skyline's underlying nature is predominantly owner-occupied and it is unable to generate an overall income and spread the risk of loss through higher charges on goods and services. *See Mirza, supra,* 92 *N.J.* at 397, 456 *A.*2d 518; *Abraham, supra,* 281 *N.J.Super.* at 85, 656 *A.*2d 850.

Accordingly, we conclude that balancing all relevant factors leads to the conclusion that Skyline is not subject to sidewalk liability pursuant to *Stewart, supra,* 87 *N.J.* at 149, 432 *A.*2d 881. Thus, we conclude that there is no basis from which a reasonable trier of fact could find that Skyline was a commercial entity. *See Brill, supra,* 142 *N.J.* at 540, 666 *A.*2d 146; *Pico v. State,* 116 *N.J.* 55, 57, 560 *A.*2d 1193 (1989).

### *Hoboken's Common Law Liability*

Luchejko argues that Hoboken's failure to adhere to its own policies and procedures in conducting inspections of the sidewalks to determine whether the property owners were in compliance with the Hoboken codes is beyond the scope of any immunity protection provided to Hoboken. We disagree.

In 1972, the Legislature enacted the Tort Claims Act (TCA), *N.J.S.A.* 59:1–1 to 12–3, in response to the judiciary's weakening of the traditional doctrine of sovereign immunity. *See Manna v. State,* 129 *N.J.* 341, 346, 609 *A.*2d 757 (1992). The Legislature recognized the inequitable results, which could occur from a strict application of sovereign immunity, however, it still chose to limit State liability through an initial presumption of immunity. *Ibid. N.J.S.A.* 59:2–1(a) makes explicit this presumption of immunity, providing that "[e]xcept as otherwise provided by this act, a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." Accordingly, the Supreme Court has recognized that the legislative intent of the TCA was to re-establish the immunity of all governmental bodies in New Jersey except in the circumstances enumerated in the TCA. *Ayers v. Twp. of Jackson,* 106 *N.J.* 557, 574, 525 *A.*2d 287 (1987).

When liability is established by the TCA, that liability is subject to specific immunities created by the TCA and any common law immunities. *N.J.S.A.* 59:2–1(b). Moreover, this statute "establishes the principle that even common-law and statutory immunities not contained in the [TCA] can prevail over the

[TCA's] liability provisions." *Rochinsky v. State, Dep't of Transp.,* 110 *N.J.* 399, 409, 541 *A.*2d 1029 (1988). As the Supreme Court has frequently recognized, "immunity is the dominant consideration of the [TCA]." *Id.* at 408, 541 *A.*2d 1029. The approach should therefore be "whether an immunity applies and if not, should liability attach. It is hoped that in utilizing this approach[,] the courts will exercise restraint in the acceptance of novel causes of action against public entities." *Ayers, supra,* 106 *N.J.* at 574, 525 *A.*2d 287.

The TCA provides immunity for injuries "caused solely by the effect on the use of streets and highways of weather conditions." *N.J.S.A.* 59:4–7. That immunity does not apply here because Luchejko's injuries occurred on a sidewalk, not a street or highway and were "allegedly caused by a combination of the weather and other factors." *Lathers v. Twp. of West Windsor,* 308 *N.J.Super.* 301, 303, 705 *A.*2d 1259 (App.Div.), *certif. denied,* 154 *N.J.* 609, 713 *A.*2d 500 (1998).

 Prior to the TCA, however, the courts recognized a common law immunity for the removal of snow from public property. The immunity was established in *Miehl v. Darpino,* 53 *N.J.* 49, 247 *A.*2d 878 (1968), and survived the passage of the TCA. *Rochinsky, supra,* 110 *N.J.* at 414, 541 *A.*2d 1029. The Supreme Court has recognized that "the common-law immunity for the snow-removal activities of public entities to be among the most significant immunities recognized by judicial decision prior to the adoption of the [TCA]." *Ibid.* In so finding, the Court noted:

[n]o matter how effective an entity's snow-removal activities may be, a multitude of claims could be filed after every snowstorm. We can conceive of no other governmental function that would expose public entities to more litigation if this immunity were to be abrogated.

[*Id.* at 413, 541 *A.*2d 1029.]

The imposition of liability for injuries arising from its snow removal activities would require the public entity to "broom sweep all the traveled portions of the streets, driveways and sidewalks." *Miehl, supra,* 53 *N.J.* at 53, 247 *A.*2d 878. "The high cost of such an undertaking could make the expense of any extensive program

of snow removal prohibitive and could result in no program or in an inadequate partial program." *Id.* at 54, 247 *A.*2d 878. Therefore, as "[t]he public is greatly benefited even by snow removal which does not attain the acme of perfection of 'broom swept' streets, a public entity will not be held liable for any injuries resulting from its snow removal activities." *Lathers, supra,* 308 *N.J.Super.* at 304, 705 *A.*2d 1259 (quoting *Miehl, supra,* 53 *N.J.* at 54, 247 *A.*2d 878) (alterations in original).

The common law immunity applies to situations where a public entity fails to prevent melting snow from running onto the adjacent sidewalk and refreezing or where the entity fails to remove the ice once it accumulates. *Lathers, supra,* 308 *N.J.Super.* at 304, 705 *A.*2d 1259; *Farias v. Twp. of Westfield,* 297 *N.J.Super.* 395, 402, 688 *A.*2d 151 (App.Div.1997). Thus, we have found that the immunity applies even if a Luchejko were to argue that the public entity's liability "rested in its failure to salt and sand the icy patches once formed, rather than to simply argue that the snow was removed negligently in the first instance[.]" *Lathers, supra,* 308 *N.J.Super.* at 305, 705 *A.*2d 1259.

Here, Luchejko argues that the snow was negligently removed in the first instance and also that Hoboken was negligent in allowing the snow bank to melt and refreeze. Luchejko does not allege that Hoboken was actually aware of the ice patch and "blatantly ignored it." *Lathers, supra,* 308 *N.J.Super.* at 305, 705 *A.*2d 1259; *see also Rochinsky, supra,* 110 *N.J.* at 415 n. 7, 541 *A.*2d 1029 (finding a possible exception to the common law immunity were the public entity's conduct was "unrelated to snow-removal activity" and amounted to "palpably unreasonable failure to warn of a dangerous condition"). As already noted, we have previously held that it is this type of activity that the Supreme Court specifically intended to immunize. *Lathers, supra,* 308 *N.J.Super.* at 304, 705 *A.*2d 1259. Pursuant to *Miehl, supra,* 53 *N.J.* at 54, 247 *A.*2d 878, and its progeny, Hoboken in this case is immune from liability for injuries resulting from its snow removal activities. The fact that Hoboken may have created a snow bank,

which may have lead to the accumulation of ice on the sidewalk, is not enough to establish liability pursuant to the TCA.

### Hoboken's Failure to Enforce Its Own Ordinance

 Luchejko also contends that Hoboken's failure to enforce the local ordinance that requires property owners to remove snow from the adjacent sidewalks falls outside of any immunity. As stated previously, Section 168–8(A) of the Hoboken City Code requires the person in charge of any building or lot within Hoboken to remove the snow and ice from the sidewalk abutting their property and pile it not more than eighteen inches from the curb line into the public street. This is to be accomplished within the first six hours after every fall of snow or hail or after the formation of any ice upon the sidewalk. According to Luchejko's argument, Hoboken's failure to inspect the area in front of the Skyline complex within six hours of the snow fall constituted common law negligence and was not protected by immunity. We disagree. [6]

This argument fails in light of the intent of the TCA, which is that immunity prevails over liability unless enumerated specifically in the TCA. *Rochinsky, supra,* 110 *N.J.* at 409, 541 *A.*2d 1029. Moreover, statutory immunity applies in this instance pursuant to *N.J.S.A.* 59:2–4, which provides that "[a] public entity is not liable for any injury caused by adopting or failing to adopt a law or by failing to enforce any law." We have found this section to provide public entities with immunity from liability in a number of situations. *See Sharra v. City of Atlantic City,* 199 *N.J.Super.* 535, 542, 489 *A.*2d 1252 (App.Div.1985) (no liability for failure to provide bicycle lanes pursuant to ordinance); *Cogsville v. City of Trenton,* 159 *N.J.Super.* 71, 74, 386 *A.*2d 1362 (App.Div.1978) (no liability for failure to remove a vicious dog from the streets); *Cadmus v. Long Branch Board of Educ.,* 155 *N.J.Super.* 42, 46, 382 *A.*2d 98 (Law Div.1977) (no liability for failure to enforce federal and State work safety regulations); *Nat'l Spring Co. v. Pierpont Assocs.,* 146 *N.J.Super.* 63, 68, 368 *A.*2d 973 (Law

Div.1976) (no liability for failure to enforce fire ordinance). Thus, in addition to having immunity pursuant to the common law immunity established in *Miehl, supra,* 53 *N.J.* at 54, 247 *A.*2d 878, Hoboken's failure to inspect the sidewalk adjacent to Skyline in accordance with its ordinance is further immunized pursuant to *N.J.S.A.* 59:2–4. In short, there would be no basis for plaintiff's claim.

### Palpably Unreasonable Conduct by Hoboken

Luchejko also argues that the judge erred in finding Hoboken's actions were not palpably unreasonable as such a determination is a jury function. We disagree. The liability provision Luchejko contends applies in this case deals with the liability a public entity may incur for dangerous conditions of its property either created by the public entity or of which the entity had actual or constructive notice. *N.J.S.A.* 59:4–2. If *Miehl* had been abrogated by the TCA or no statutory immunities applied, this provision might establish liability. *See Rochinsky, supra,* 110 *N.J.* at 410, 541 *A.*2d 1029. However that is not the case. Thus, Hoboken is immune from liability pursuant to the common law immunity established in *Miehl, supra,* 53 *N.J.* at 54, 247 *A.*2d 878, and the statutory immunity set forth in *N.J.S.A.* 59:2–4. Because *N.J.S.A.* 59:2–1(b) provides that any common law or statutory immunities prevail over the TCA's liability provisions, we do not reach this question.

### Hoboken's Municipal Ordinance

Luchejko also argues that the existence of the municipal ordinance should be another factor for the court to consider in determining Skyline's sidewalk liability. However, "[i]t remains beyond peradventure 'that municipal ordinances do not create a tort duty, as a matter of law.'" *Smith, supra,* 300 *N.J.Super.* at 95, 692 *A.*2d 76 (quoting *Brown, supra,* 111 *N.J.* at 335, 544 *A.*2d 842). Rather, an ordinance may establish a standard of conduct only if the person attempting to bring a claim is "of the class for whose benefit it was enacted" and if the breach of the ordinance "was the efficient cause of the injury of which he complains."

*Carrino v. Novotny,* 78 *N.J.* 355, 359, 396 *A.*2d 561 (1979). The ordinance must further be germane to the type of hazard involved. *Ibid.* Here, Hoboken's ordinance does not mention the type of injury involved nor does it mention Luchejko as a beneficiary. The ordinance therefore should not be considered in determining liability.

### Assumption of Duty by Skyline and/or CM3

Luchejko argues that Skyline and CM3 assumed the duty of snow removal and, in doing so, negligently created a new element of danger, thereby making Skyline liable for Luchejko's injuries. We disagree.

A landowner who has no duty to clear a sidewalk of snow and ice but who voluntarily undertakes the task of doing so will be liable if "through his negligence a new element of danger or hazard, other than one caused by natural forces, is added to the safe use of the sidewalk by a pedestrian." *Saco v. Hall,* 1 *N.J.* 377, 381, 63 *A.*2d 887 (1949); see also *Gentile v. National Newark & Essex Bkg. Co.,* 53 *N.J.Super.* 35, 39, 146 *A.*2d 471 (App.Div. 1958) (stating that "[t]he property owner is only liable if, in clearing the sidewalk, he increases the natural hazard by introducing some new element of danger"). According, to plaintiff, he fell on a "sheet of black ice" on the sidewalk. Hoboken Police Officer John Orrico indicated that the sidewalk was "icy." Thus, plaintiff's fall was caused by ice created by natural forces. Plaintiff has made no showing that defendants introduced a new hazard or danger on the sidewalk in their snow removal activities. See *Foley v. Ulrich,* 94 *N.J.Super.* 410, 420, 228 *A.*2d 702 (App.Div.) (Kolovsky, J., dissenting), *rev'd on dissent,* 50 *N.J.* 426, 236 *A.*2d 137 (1967)(landowners who shoveled snow from sidewalk were not liable to a pedestrian who fell on ice created after snow had melted, collected in a depression in the sidewalk, and then froze).

Luchejko further argues that CM3 was not an agent of Skyline, but was rather an independent contractor with a non-delegable duty to keep the premises it was hired to maintain and manage

safe and free from hazards. Once again, there is no evidence in the record that the removal of the snow introduced a new hazard or danger to sustain a claim of liability against CM3. Moreover, CM3 simply hired D & D, which did the actual shoveling of the snow.

Affirmed.