**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1091-15T4

AIDA MINEROS,

    Plaintiff-Appellant,

v.

DIANA LONDON,

    Defendant-Respondent,

and

CITY OF HOBOKEN and COUNTY
OF HUDSON,

    Defendants.

_____

Argued October 24, 2017 — Decided June 19, 2018

Before Judges Carroll, Leone, and Mawla.

On appeal from Superior Court of New Jersey,
Law Division, Hudson County, Docket No.
L-3794-13.

George Sommers argued the cause for appellant.

Moira E. Colquhoun argued the cause for
respondent (Colquhoun & Colquhoun, PA,
attorneys; Moira E. Colquhoun, on the brief).

PER CURIAM

Plaintiff Aida Mineros alleges she tripped and fell on a defective sidewalk in front of a building owned by defendant Diana London. Plaintiff claims the building is commercial in nature, which would impose on defendant an obligation to maintain the sidewalk. Plaintiff appeals from an August 21, 2015 order granting summary judgment to defendant, and an October 29, 2015 order denying reconsideration. We reverse and remand.

I.

The following facts were undisputed. On February 14, 2013, plaintiff was walking on the sidewalk on Garden Street in Hoboken. She alleged she tripped and fell as a result of an upraised segment of the sidewalk adjacent to a building on Garden Street (Building). Defendant is the owner of the Building. She lives in one unit of the Building, which is a multi-family residence. The second-floor unit and third-floor unit were rented, independent apartments. The first floor included a glass-enclosed porch or sunroom. The basement was renovated within the last two years. It has a hallway, at least one bedroom, a bathroom, a utility room, a meter room with four electric meters and four gas meters, and a staircase to the first floor.

Defendant contended the Building is a three-family residence; plaintiff conceded it was a three-family residence when a court-ordered inspection occurred on April 20, 2015, but contended that

on the date of the accident it was a four-family residence, including a basement apartment.

On April 20, 2015, during pretrial discovery, plaintiff's counsel inspected the Building, accompanied by Ceasar Landivar, who took photographs. They inspected the first floor, basement, and exterior of the Building.

After the discovery end date, defendant moved for summary judgment. Plaintiff cross-moved for partial summary judgment. Among the attachments to plaintiff's motion were a July 14, 2015 affidavit by Landivar that stated the majority of the square footage of the property was used for rental purposes, and a letter from Guy Magnusson, Esq., that stated defendant had a commercial liability insurance policy.

On August 21, 2015, the trial court granted defendant's motion and denied plaintiff's cross-motion. The court refused to consider Landivar's affidavit and Magnusson's letter, finding they were inadmissible. Plaintiff moved for reconsideration, which the court denied on October 29, 2015. Plaintiff appeals.

## II.

"Our review of a summary judgment ruling is de novo." Conley v. Guerrero, 228 N.J. 339, 346 (2017). Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show

that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). "An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact." Ibid.

The court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). "[T]he court must accept as true all the evidence which supports the position of the party defending against the motion and must accord [that party] the benefit of all legitimate inferences which can be deduced therefrom[.]" Id. at 535 (citation omitted).

### III.

"When, as in this case, a trial court is 'confronted with an evidence determination precedent to ruling on a summary judgment motion,' it 'squarely must address the evidence decision first.'" Townsend v. Pierre, 221 N.J. 36, 53 (2015) (citation omitted). "Appellate review of the trial court's decisions proceeds in the

same sequence, with the evidentiary issue resolved first, followed by the summary judgment determination of the trial court." Ibid. Accordingly, we initially consider the admissibility of Landivar's affidavit and Magnusson's letter.

"[C]onsiderable latitude is afforded a trial court in determining whether to admit evidence, and that determination will be reversed only if it constitutes an abuse of discretion." State v. Kuropchak, 221 N.J. 368, 385 (2015) (citation omitted). "Under that standard, an appellate court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling "was so wide of the mark that a manifest denial of justice resulted."'" Ibid. (citations omitted). We must hew to that standard of review.

### A.

"A certification will support the grant [or denial] of summary judgment only if the material facts alleged therein are based, as required by Rule 1:6-6, on 'personal knowledge.'" Wells Fargo Bank, N.A. v. Ford, 418 N.J. Super. 592, 599 (App. Div. 2011). Rule 1:6-6 provides: "If a motion is based on facts not appearing of record or not judicially noticeable, the court may hear it on affidavits made on personal knowledge, setting forth only facts which are admissible in evidence to which the affiant is competent to testify[.]"

Landivar's July 14, 2015 affidavit stated as follows. He is a real estate agent. He took photographs and inspected the first floor and basement of the Building on April 20, 2015. He later returned and took measurements of the exterior, finding the Building to be 16.85 feet wide and 34.17 feet deep. Multiplying those numbers, he stated the first, second and third floors were each "approximately 575.76 square feet." The first floor's glass-enclosed porch added "approximately 225 square feet."

Regarding the basement, Landivar's affidavit stated: the hallway and the utility room were each "approximately 100 square feet"; the meter room was "approximately 40 square feet"; the staircase "had a 'footprint' of approximately 40 square feet"; the bathroom was "approximately 56 square feet"; and the bedroom was "approximately 180 square feet."

Landivar's affidavit opined that the basement meter room, utility room, hallway, and staircase footprint were essential for operating the business of renting out the second- and third-floor. Those basement spaces and the rented second- and third-floors had a total of "approximately 1431.52" square feet used for defendant's business. The basement bedroom, basement bathroom, and the first-floor interior totaled "approximately 811.76 square feet" used as a residence by defendant, plus the enclosed porch's "approximately 225 square feet."

A-1091-15T4

In granting summary judgment for defendant on August 21, 2015, the trial court ruled it would "not consider the statements contained in Landivar's affidavit as they are in violation of R. 1:6-6." The court stated "Landivar's affidavit contains various figures regarding square footage yet Landivar never took any measurements of the [p]remises; therefore any measurements contained in his affidavit are based on speculation."

Plaintiff moved for reconsideration, attaching a September 21, 2015 affidavit from Landivar. Landivar stated that he had been a real estate agent for more than seven years, that he had "visually inspected about two thousand properties . . . for the purpose of estimating square footage," and that he did "not need to use a tape measure for a good estimate." He said he "walked off distances" and "used physical features" such as floor tiles and stair steps "to aid [him] in measuring distances" during the inspection. He stated his purposes in visiting the Building were "to take photographs, estimate square footage of various parts of the building, and observe anything that might be relevant to determining how [the Building] was being used or had been used in the past."

In its October 29, 2015 opinion denying reconsideration, the trial court decided to consider "this new certification of Mr. Landivar" as it "enlighten[ed] the [c]ourt as to what he did when

he entered the defendant's house." The court found its earlier belief that Landivar did not take measurements was "incorrect." "Landivar did take measurements while in the basement and first floor, but those measurements were not with the use of measuring devices, but through approximation." Nonetheless, the court reiterated that "the estimated measurements . . . are speculative and the trial judge might find them unreliable."

However, estimates of distance may be admissible evidence. Our highest court has repeatedly observed that opinions about "distance" is one of the "[t]raditional examples of permissible lay opinions." State v. McLean, 205 N.J. 438, 457 (2011) (citing State v. Haskins, 131 N.J. 643, 649 (1993)); State v. Laster, 71 N.J.L. 586, 588-89 (E. & A. 1905). As Landivar stated, his opinion of the square footage of various spaces was simply the product of multiplying two estimates of distance, namely the width and length of the space. Such opinions concerning "distance" have long been a "prototypical example[s]" of proper lay opinion. Fed. R. Evid. 701, Advisory Committee Note on the 2000 Amendments (quoting Asplundh Mfg. Div. v. Benton Harbor Eng'q, 57 F.3d 1190, 1196 (3d Cir. 1995)).

Lay opinion testimony is admissible under N.J.R.E. 701. That rule provides: "If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be

admitted if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue." Ibid. Landivar attested he based his estimates on his own perceptions while inspecting the Building. Moreover, Landivar's estimates assisted in determining a fact in issue, namely "the predominant use of the property, including the amount of space occupied by the owner on a steady or temporary basis to determine whether the property is utilized in whole or in substantial part as a place of residence." Grijalba v. Floro, 431 N.J. Super. 57, 73 (App. Div. 2013).

Landivar's opinions on distances and square footage were not inadmissible because he did not use a measuring device. The longest distance he measured was less than thirty-five feet. Such a short distance can be visually estimated. See United States v. Peters, 743 F.3d 1113, 1114, 1116-17 (7th Cir. 2014) (upholding the admission of a visual estimate that one vehicle was fifty to seventy-five feet behind another). Opinions concerning even longer distances can be measured by "pacing out the distance," as Landivar stated he did for some of the distances. See United States v. Panton, 846 F.2d 1335, 1337 (11th Cir. 1988). This was not such a long distance that a tape measure or more sophisticated measuring device was needed. Cf. Haskins, 131 N.J. at 646-47, 650

(upholding the admission of tape-measure estimates of whether drugs were sold within the one-thousand-foot distance of a school).

Making visual observations, pacing off, and utilizing tiles and steps to estimate distances may not be as accurate or reliable as using a measuring device, and thus may not persuade the factfinder. However, that did not make it inadmissible. Indeed, the trial court relied on defendant's certification, which gave the same 16.85-foot width for the Building as Landivar, and stated "[t]he approximate total square footage" of her residence and of the tenants' apartments, without any explanation of how she made her estimates. Therefore, we cannot sustain the court's August 21 ruling or its corrected October 29 ruling on the grounds such estimates are speculative and inadmissible.

The trial court's October 29 opinion also gave other grounds for refusing to consider Landivar's affidavit. The court mistakenly stated that "[t]here was no request by plaintiff's counsel to be permitted to take measurements." However, plaintiff served a notice to permit entry upon land "for the purpose of inspection, measuring, surveying, photographing, testing, [and] sampling the property." Thus, plaintiff's notice requested the full rights of entry upon land permitted by Rule 4:18-1(a)(2), including both "inspection and measuring." Ibid. Moreover, in moving to compel entry upon land, plaintiff's counsel certified

inspection was necessary "to compare the space devoted to the owner's residential occupancy and the space devoted to income-generating apartments."

Defendant objected that any entry would be an invasion of her and her tenants' privacy. After a March 25, 2015 hearing, the trial court, ordered: "Plaintiff's counsel and/or his experts shall be permitted to inspect the First Floor and Basement of the [Building]. A representative of the Plaintiff shall be permitted to take photographs in authorized areas."

The court's October 29 opinion stated that Landivar's measurements "went beyond" the March 25, 2015 order. However, defense counsel, who followed Landivar throughout the inspection, certified "[n]o measurements of any kind were taken during the inspection as they were not permitted by the court's Order." Thus, it does not appear the order was violated even if it precluded use of measuring devices or other physical measurements. In any event, the order did not preclude those inspecting the Building from making visual observations or walking through the spaces, nor did that intrude on privacy, which was the issue at the hearing.[1]

Finally, the trial court stated in its October 29 opinion:

---

[1] If defense counsel's certification creates a genuine issue of whether Landivar did make visual observations or walk off distances, that is an issue for the factfinder to resolve.

> Landivar's speculative opinions were provided
> with the knowledge they would be used as a
> substitute for expert opinion. This is not
> permitted under our discovery rules. . . .
> There is no written report because he is not
> an expert. That is a problem. This is trial
> by surprise. The [c]ourt finds his testimony
> is not competent evidence. Therefore, the
> [c]ourt will not consider it and reaffirms its
> prior decision[.]

However, Landivar's opinions on distances and square footage were appropriate lay opinions, not expert opinion. Landivar did not claim to be an expert on distances in his July 14 affidavit. After the trial court excluded his estimates as speculative, Landivar's September 21 affidavit cited his experience in estimating square footage, but his lay opinions on distances were admissible without reference to such experience, because they were "firmly rooted in the personal observations and perceptions of the lay witness." McLean, 205 N.J. at 459.

Defendant asserts that Landivar had not been named in discovery as a witness, but presents us with no interrogatories or answers regarding the identity of witnesses. In any event, as the trial court explained, its March 25 order "granted permission for plaintiff's counsel, a person to take photographs and an expert to enter the basement and the first floor" because "plaintiff's counsel could not be a witness." Defense counsel accompanied Landivar, who took photographs. Thus, defendant had notice

12

Landivar might be a witness. Courts grant entry upon land under Rule 4:18-1(a)(2) when it will "lead to the discovery of relevant evidence," and Landivar was the only person who could testify to the evidence discovered. Traetto v. Palazzo, 436 N.J. Super. 6, 14-15 (App. Div. 2014).

Thus, Landivar's opinions on distances and square footage, and his observations on the equipment he saw in various rooms, were admissible and should have been considered. See, e.g., Atlas v. Silvan, 128 N.J. Super. 247, 251 (App. Div. 1974) (affirming the admission of a lot purchaser's lay testimony about the "size of the property"); Gretowski v. Hall Motor Exp., 25 N.J. Super. 192, 195-97 (App. Div. 1953) (reversing the exclusion of "the testimony of the witness relative to the widths of the cars and of the traffic lanes and of the relative positions of the vehicles on the highway" because lay witnesses can opine on "height, depth, thickness, [and] width").[2] The trial court could not base its summary judgment ruling on defendant's estimates of square footage without considering Landivar's differing estimates.

---

[2] On the other hand, it would not have been an abuse of discretion to exclude those portions of Landivar's affidavit which exceeded the bounds of lay opinion by opining that the utility room and meter room, which provided services to both defendant's residence and the tenants' apartments, and the hallway and staircase providing access to those rooms, should be counted solely as commercial.

B.

To oppose summary judgment by showing defendant had a commercial insurance policy on the Building, plaintiff's counsel submitted a certification attaching "a true copy" of (1) the declarations page of a "Combination Dwelling Policy" issued to defendant by Farmers Mutual Fire Insurance Company with a $1,000,000 liability coverage for each occurrence, and (2) Magnusson's January 15, 2015 letter to plaintiff's counsel and defense counsel. In the letter, Magnusson asked for an update on the litigation, stating that his "office was retained by State Farm Insurance Company to represent [defendant] under a tenant's policy regarding the unit she lives in at [the Building]," and that defense counsel was representing defendant "pursuant to a commercial general liability policy insuring the building located at [the Building]." The trial court found the Magnusson letter was "insufficient to demonstrate that Defendant had a commercial policy as it is inadmissible hearsay."

"[E]vidence submitted in support of a motion for summary judgment must be admissible." Jeter v. Stevenson, 284 N.J. Super. 229, 233 (App. Div. 1995). If "the certifying attorney [lacks] any firsthand knowledge concerning the exhibits or facts contained therein," the document must be shown to be admissible. See Sellers v. Schonfeld, 270 N.J. Super. 424, 428 (App. Div. 1993). "Hearsay

14                                                          A-1091-15T4

may only be considered if admissible pursuant to an exception to the hearsay rule." New Century Fin. Servs., Inc. v. Oughla, 437 N.J. Super. 299, 317 (App. Div. 2014).

Plaintiff argues Magnusson's letter is admissible hearsay as "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." N.J.R.E. 803(b)(4). We agree. Magnusson identified himself as representing defendant, he made his statement during the existence of that representation, and his statement concerned a matter within the scope of that representation, namely the suit against defendant. "Under New Jersey's very broad concepts of admissibility of evidence," Magnusson's letter generally met the limited requirements of N.J.R.E. 803(b)(4). Spencer v. Bristol-Meyers Squibb Co., 156 N.J. 455, 462-63 (1998) (citation omitted).

Defendant asserts Magnusson represented State Farm, not defendant. However, when an insurance company provides its insured with an attorney, "[t]he intrusion of the insurance contract does not alter the fact that the relationship with the insured is that of attorney and client," and "that the relationship is the same as if the attorney were hired and paid directly by the insured." Lieberman v. Emp'rs Ins. of Wausau, 84 N.J. 325, 338 (1980) (citations omitted).

Defendant also asserts that "[a]n admission, by an attorney, to be binding upon his client, must be distinct and formal, and made for the express purpose of dispensing with the formal proof of some fact at the trial." Hogenson v. Serv. Armament Co., 461 P.2d 311, 314 (Wash. 1969) (quoting State v. Wheeler, 161 P. 373, 374 (1916)); see Czuj v. Toresco Enters., 239 N.J. Super. 123, 128 (Law Div. 1989). However, the issue of whether an attorney's statement is binding as a stipulation should be a different issue than whether it is admissible in evidence under N.J.R.E. 803(b)(4).

Nonetheless, Magnusson's statement that defense counsel was representing defendant under a commercial general liability policy was "only admissible under N.J.R.E. 803(b)(4) if it would have been admissible if made by the declarant at the hearing." Spencer, 156 N.J. at 461 (quoting Richard J. Biunno, Current N.J. Rules of Evidence, cmt. 4 on N.J.R.E. 803(b)(4) (1998)); see N.J.R.E. 805. Thus, if the declarant's statement was itself only hearsay, and not admissible under any of the exceptions to the hearsay exclusionary rule, it could not be admissible under N.J.R.E. 803(b)(4). It is unclear whether Magnusson's statement was inadmissible hearsay, admissible hearsay based on statements by defendant or defense counsel, or personal knowledge based on Magnusson's examination of the Farmers Mutual policy.

A-1091-15T4

The trial court instead relied on defense counsel's certification that she had "been engaged in defending [Farmers] Mutual insureds for 25+ years," that she was "familiar with the Combination Dwelling Policy," and that it was "a personal lines policy and not a commercial lines policy." However, it is likewise unclear how defense counsel's statement would have been admissible. As the court pointed out, defense counsel was "certainly not going to be testifying at trial." Defense counsel responded that defendant would testify that it was a personal policy, but submitted no certification from defendant or any basis for such testimony.

We conclude that neither party showed she had admissible evidence that the combination dwelling policy was commercial or personal in nature. Therefore, the trial court erred in concluding the combination dwelling policy was "a personal lines policy." Because the parties presented the court "with an inadequate record, we are unable to conclude that there is no genuine issue" as to the nature of the insurance policy. Lyons v. Twp. of Wayne, 185 N.J. 426, 437 (2005).

IV.

We must consider whether the remaining competent evidence showed "that there [wa]s no genuine issue as to any material fact challenged and that the moving party [wa]s entitled to a judgment

or order as a matter of law." R. 4:46-2(c). We first address the governing substantive law.

Until Stewart v. 104 Wallace St., Inc., 87 N.J. 146 (1981), "[g]enerally, property owners, both commercial and residential, were 'not liable for the condition of a sidewalk caused by the action of the elements or by wear and tear incident to public use.'" Qian v. Toll Bros. Inc., 223 N.J. 124, 135-36 (2015) (quoting Yanhko v. Fane, 70 N.J. 528, 532 (1976)). In Stewart, our Supreme Court partially "overrule[d] Yanhko and h[e]ld that a plaintiff has a cause of action against a commercial property owner for injuries sustained on a deteriorated sidewalk abutting that commercial property when that owner negligently fails to maintain the sidewalk in reasonably good condition." 87 N.J. at 149. The Court did "not reach the question of whether the same duty should be imposed on owners of residential property." Id. at 159 n.6. "Since Stewart, residential-public-sidewalk immunity has remained intact." Qian, 223 N.J. at 136.

The Court in Stewart explained: "As for the determination of which properties will be covered by the rule we adopt today, commonly accepted definitions of 'commercial' and 'residential' property should apply, with difficult cases to be decided as they arise." Id. at 160. The Court stated that "apartment buildings would be 'commercial' properties covered by the rule." Id. at 160

n.7. The Court later held a couple's ownership of a three-family residence in which they did not reside and which they rented out for profit "was clearly a business pursuit," and the plaintiff's "claim against the [couple] for maintaining a dangerous condition on the sidewalk abutting their property is cognizable only because of the commercial nature of the [couple's] ownership." Wickner v. Am. Reliance Ins. Co., 141 N.J. 392, 394, 400-01 (1995).

Since Stewart, "the Appellate Division has parsed closely whether 'residential' property has been decamped to commercial demarcation through various uses made of the premises." Luchejko v. City of Hoboken, 207 N.J. 191, 206 & n.5 (2011). Among the "difficult cases [which] have probed the gray area of the commercial/residential distinction" are owner-occupied residences where some of the space is rented to tenants. Id. at 209-10 & n.6 (citing Avallone v. Mortimer, 252 N.J. Super. 434, 438 (App. Div. 1991) (acknowledging immunity for "owner-occupants whose residency is established to be the predominant use," but reversing summary judgment for defendants and remanding "to permit exploration of the predominance of use issue")). "[I]n determining whether an owner-occupied two-or three-family home is deemed 'residential' or 'commercial,' courts have considered the nature of the ownership of property and the predominant use of that property." Grijalba, 431 N.J. Super. at 67.

19

In Grijalba, it was asserted that the defendant resided in the basement and rented out the two-family house above. Id. at 59-60. We reversed summary judgment for defendants and remanded for consideration of the following factors to determine whether such a property was commercial or residential:

> (1) the nature of the ownership of the property, including whether the property is owned for investment or business purposes; (2) the predominant use of the property, including the amount of space occupied by the owner on a steady or temporary basis to determine whether the property is utilized in whole or in substantial part as a place of residence; (3) whether the property has the capacity to generate income, including a comparison between the carrying costs with the amount of rent charged to determine if the owner is realizing a profit; and (4) any other relevant factor when applying "commonly accepted definitions of 'commercial' and 'residential' property."
>
> [Id. at 73.]

Here, the trial court recognized that "[d]espite the extensive body of case law on Stewart liability, there are no reported decisions addressing the factual context at issue here[:] whether an owner[-]occupied three-family building where the units are rented at market rates is commercial or residential." The court applied Grijalba's four factors.

A.

The first factor is "the nature of the ownership of the property, including whether the property is owned for investment or business purposes." Ibid. The trial court found "Defendant's Property is primarily her residence," and her renting out the second and third floors was "incidental to the Property's primary use[:] serving as Defendant's residence."

It is difficult to reach that finding under the summary judgment standard. The trial court referenced facts set forth in defendant's certification that she lived there twelve months a year and that she bought the property in 1982. An owner's full-time, long-term residence is more likely to indicate residential ownership than part-time, recent residence. See Avallone, 252 N.J. Super. 438. However, the evidence indicated defendant also owned the Building for "business purposes, such as to yield a profit," as discussed below. Grijalba, 431 N.J. Super. at 72. Defendant's answers to supplemental interrogatories showed she had rented out both apartments since at least 2003, for between $1340 and $1675 per month.

Where a property was used for residential purposes but owned solely for commercial purposes, like an apartment building, "it was the nature of the ownership that mattered, not the use to which the property is put." Hambright v. Yglesias, 200 N.J. Super. 392, 395 (App. Div. 1985). However, where the owner both resides

21

in and rents out the property, the nature of the ownership is difficult to discern, and this factor becomes less telling. "Normally, the nature of the ownership is considered, but with mixed-use property, such as an owner-occupied two- or three-family home, use has generally been a relevant consideration when resolving the residential-commercial distinction." Grijalba, 431 N.J. Super. at 65. Thus, we examine the predominant use of the Building.

### B.

The second factor is "the predominant use of the property, including the amount of space occupied by the owner on a steady or temporary basis to determine whether the property is utilized in whole or in substantial part as a place of residence." Id. at 73. For such mixed-use properties, we have held that "the residential sidewalk exception be continued for owner-occupants whose residency is established to be the predominant use." Avallone, 252 N.J. Super. at 438. If "[t]he area leased is a small portion of the total area," then "[s]uch an arrangement would be predominantly residential." Id. at 438-39 (remanding "to permit exploration of the predominance of use issue"); see Grijalba, 431 N.J. Super. at 73 (remanding because "the record is silent regarding the size of the house and the amount of space that [the owner] occupied on the date of the accident").

For the reasons previously discussed, we must void the trial court's finding on predominant use. The court improperly refused to consider Landivar's affidavit, and instead mistakenly credited defendant's certification that "the approximate square footage of the premises [on which defendant resides] is 1,600 square feet whereas the square footage of the other apartments equals 967 square feet." The trial court concluded: "Because the space occupied by Defendant exceeds that of the Tenants, the [c]ourt finds that the predominant use factor favors a residential status."

As set forth above, Landivar's affidavit constituted competent evidence that the rented second- and third-floor apartments totaled approximately 1151.52 square feet, and that defendant's first-floor residence was approximately 575.76 square feet. Landivar noted that the first floor also included a glass-enclosed porch of approximately 225 square feet, but that it "appeared to be new construction."

Regarding the basement, Landivar attested that the basement's approximately 100-square-foot utility room contained three water heaters and at least four water lines, including two heaters and two water lines for the tenants' apartments. He swore the approximately forty-square-foot meter room included four gas meters and four electrical meters, with a gas and electric meter for each of the tenants' apartments. This evidence indicated the

23

approximate 140 square feet of these rooms were utilized for the commercial use as well as defendant's residential use. Similarly, Landivar noted that the approximately 100-square foot hallway and the staircase with a footprint of 40-square feet were the only access to those two mixed-use rooms, indicating they served both the commercial use and defendant's residential use. Landivar did not contest that the basement bedroom and bathroom, totaling approximately 236 square feet, were not currently in commercial use.

Therefore, according to Landivar's affidavit, approximately 280 square feet served both the commercial rental use and defendant's residential use, approximately 1151.52 square feet were indisputably devoted solely to the commercial use, and approximately 811.76 (575.76 + 225) square feet were devoted solely to defendant's residential use. If the glassed-in porch is counted toward defendant's residential use, the total of approximately 1036.76 (575.76 + 225 + 236) square feet currently devoted solely to defendant's residential use is still less than the 1151.52 square feet devoted solely to commercial use. Thus, Landivar's

affidavit raised a genuine issue of material fact as to the predominant use of the Building.[3]

Landivar also asserted facts indicating the basement may have been a separate, fourth apartment when plaintiff allegedly fell on February 14, 2013. He cited the four electric meters, four gas meters, at least four water mains, and four buzzers to the building. His affidavit stated "[t]he renovations in the basement appeared very recent," including a water heater with "a build in date of March 3, 2014." Defendant conceded the "basement was damaged as a result of Superstorm Sandy, and was repaired as a result." As Superstorm Sandy struck less than four months before plaintiff's alleged fall, a genuine issue was raised as to whether the renovations occurred after the incident. Moreover, defendant's certification stated there is a second bedroom in the basement, raising the question of the use to which that room was put before the renovations.[4]

---

[3] Defendant filed a reply certification asserting that the first floor is 872 square feet, and that the total tenant space is 961 square feet. These figures differ from defendant's original certification as well as Landivar's certification. Moreover, defendant provides no information on the square footage of the basement. Defendant's reply certification highlighted the existence of a genuine issue of material fact.

[4] Plaintiff also cites the original answer, in which defense counsel admitted paragraph 8 of the amended complaint alleging: "Upon information and belief, [the Building] is a four family

A-1091-15T4

The trial court found "[t]he mere existence of four buzzers and waterlines is insufficient to create even a genuine issue of fact as to whether the property is a four-family home." However, the court did not mention the four gas meters and four water meters mentioned in Landivar's affidavit. Drawing all reasonable inferences in favor of plaintiff, the existence of four buzzers, gas meters, electrical meters, and waterlines creates a genuine issue of material fact regarding whether the Building had four units prior to the renovations. In any event, this issue can be resolved on remand as we find a genuine issue of material fact regarding the predominant use of the Building even in its current three-unit configuration.[5]

## C.

The third factor is "whether the property has the capacity to generate income, including a comparison between the carrying costs with the amount of rent charged to determine if the owner

building, including a basement apartment, including tenants other than London." However, we do not consider the original answer as evidential, as defendant amended its answer to deny the allegations in paragraph 8.

[5] Defendant's reply certification asserted that the fourth gas and electric meters serve the common entrance hall and stairs leading to the rented second and third floors, and that "[t]here are four buzzers since the bedrooms are in the basement and I cannot hear the buzzer if I am downstairs." These belatedly-asserted facts were not admitted, and added to the genuine issue of material fact.

is realizing a profit." Grijalba, 431 N.J. Super. at 73. The trial court found it was "quite apparent that Defendant's property has the capacity to generate income," but found the extent was in dispute. The court found this factor was not dispositive because

> [t]he determination of residential versus commercial status cannot be based upon profit alone, or else the status of the property would depend on the vagaries of the marketplace. In the circumstance of hybrid use, when the owner's occupancy, in terms of time or space, is greater than or equal to the rental occupancy, the property shall be considered residential regardless of whether the rental space generates a profit.
>
> [Wasserman v. W.R. Grace & Co., 281 N.J. Super. 34, 39 (App. Div. 1995) (citing Avallone, 252 N.J. Super. at 437-38).]

The trial court mistakenly relied on Wasserman, which addressed an owner's one-room home office rather than a rental apartment. Id. at 36. First, it is unclear whether defendant's "occupancy, in terms of time or space, is greater than or equal to the rental occupancy." Ibid. Second, in Avallone we required "consideration of the factors of extent of income" to help "enable a trial judge to determine whether the owner's residential occupancy preponderates." 252 N.J. Super. at 438. Third, we have since reaffirmed that, "[a]lthough we do not use profit alone to resolve the residential-commercial distinction, profit is a factor to weigh in evaluating the commercial nature of the property."

27

Grijalba, 431 N.J. Super. at 72.  Indeed, "whether a property's predominant use has the capacity to generate income, regardless of whether an actual profit is obtained through the use," is "central to the Appellate Division's inquiry." Luchejko, 207 N.J. at 206.

The capacity to generate income and profit is central because "[t]he objective in creating the commercial property exception to the no-liability rule was to impose liability upon the party in a better position to bear the costs associated with that imposition. Commercial landowners have that ability as well as the ability to distribute those costs" to their customers. Dupree v. City of Clifton, 351 N.J. Super. 237, 242 (App. Div. 2002) (citing Stewart, 87 N.J. at 158), aff'd o.b., 175 N.J. 449 (2003).  "Like the burden imposed on small business commercial property owners to maintain . . . abutting sidewalks . . . , owner-occupants who are deemed to own commercial property would be expected to spread the risk of loss to innocent third parties too," namely their tenants. Grijalba, 431 N.J. Super. at 70.

In opposing summary judgment, plaintiff submitted copies of the 2012-13 apartment leases between defendant and her tenants, showing she charged monthly rents for the second- and third-floor apartments of $1550 and $1675, respectively.  Those leases respectively would produce annual income of $18,600 and $20,100,

28                                                           A-1091-15T4

and a total of $38,700 in rental income annually for defendant. Plaintiff also submitted copies of defendant's federal tax Schedule E "Income or Loss from Rental Real Estate," showing that her rental income in 2012 and 2013 was $33,000 and $29,100 respectively, and that after deducting taxes, insurance, repairs, and other expenses, she netted $18,407 and $16,075 respectively.[6]

Given this evidence defendant's rental use of the Building had the capacity to generate income and profit, and had done so at the time of plaintiff's alleged fall, the trial court erred in dismissing this factor simply because it was disputed or non-dispositive.

### D.

The trial court cites one "other relevant factor," id. at 73, namely the nature of defendant's insurance coverage. As discussed above, there was no competent evidence supporting the trial court's finding that the combination dwelling policy was "a personal lines policy," not a commercial liability policy. Thus, we find a genuine issue on this issue as well. However, how an insurance company characterizes its policy, and insurance itself, is of limited probative value.

In Stewart, our Supreme Court only mentioned insurance thus:

---

[6] It is undisputed defendant had already paid off the mortgage.

> We recognize that the rule adopted today will increase the expenses of many businesses, and will be proportionately more burdensome to small firms than to large ones. However, we anticipate that appropriate insurance will become available and that the cost of such insurance will be treated as one of the necessary costs of doing business.
>
> [87 N.J. at 160.]

Moreover, as the concurrence noted in arguing for sidewalk liability for all property owners, a residential "owner generally may purchase an insurance policy covering liability to pedestrians injured because of defects in the sidewalk." Id. at 161 (Schreiber, J., concurring). Thus, the mere availability of insurance does not indicate a property is commercial in nature. See Luchejko, 207 N.J. at 208 (finding that "the possibility that liability insurance in sufficient amounts might be purchased by residents of a condominium organization" was no justification for imposing sidewalk liability on them).

Similarly, that insurance shares the risk of loss among the insurance company and its policyholders is not the cost sharing Stewart had in mind, because that is equally true of residential policies. Rather, "the sharing of risk originally presented in the commercial setting of Stewart" was that "the cost of the insurance could be shifted to patrons and other business endeavors of the entity as a cost of doing business." Id. at 207.

Subsequently, the Court stressed "the burden of higher insurance premiums for commercial property owners as the result of the newly imposed sidewalk liability could be spread 'through higher charges for the commercial enterprise's goods or services,' as distinct from residential owners, who must bear the" increased premium cost themselves. Brown v. St. Venantius Sch., 111 N.J. 325, 331 (1988) (quoting Mirza v. Filmore Corp., 92 N.J. 390, 397 (1983)).

The availability of insurance, or its characterization as commercial or personal, remains relevant. See Abraham v. Gupta, 281 N.J. Super. 81, 85 (App. Div. 1995). An owner-occupier's acquisition of both a personal and a commercial policy, or of a policy designed to cover leasing as a business pursuit, may be evidence that there is a commercial venture on the property. However, the characterization of the insurance is less relevant than the nature of the ownership, the predominant use of the property, and the capacity to generate income and profit.

V.

Thus, our de novo review indicates the trial court's grant of summary judgment cannot stand. The proffered evidence did not support the court's conclusion on the nature of ownership, which in any event is less clear or telling in such mixed-use situations.

A-1091-15T4

On the crucial issue of predominant use, the court mistakenly refused to consider Landivar's affidavit, which created a genuine issue of material fact as to whether the predominant use was commercial. The court found a genuine issue on whether the Building had the capacity to generate income and profit, but mistakenly dismissed that central issue as not dispositive. Finally, the court found the combined dwelling policy was personal rather than commercial, but there was little or no competent evidence on that relevant if not weighty issue.

Defendant contends that, in our prior cases, we have repeatedly rejected extending sidewalk liability to owner-occupiers who rent out part of their premises. However, in Borges v. Hamed, 247 N.J. Super. 295 (App. Div. 1991), though we found no sidewalk liability for the owner who occupied one unit of a three-family home and rented two units to the owner's family members with no evidence of profit, we expressly reserved the issue of "what should be the result if defendants lived in one apartment and rented the other two at market rates." Id. at 296. That is at issue here.

In Avallone, where the owner-occupier also rented out an apartment, we held that Stewart's "balancing approach" and consideration of the "ability to pass along cost require that the residential sidewalk exception be continued for owner-occupants

whose residency is established to be the predominant use." 252 N.J. Super. at 437-38. However, we stressed "the factors of extent of income and extent of non-owner occupancy in terms of time and space," stated that "[w]here there are factual disputes respecting those factors, or where their weight is unclear, these will require resolution by a trier of fact," and remanded for consideration of those factors. Id. at 438-39.

In Smith v. Young, 300 N.J. Super. 82 (App. Div. 1997), we found no sidewalk liability for "a co-owned, two-family home in which only one of the co-owners resides, with the remaining residential unit rented to tenants by the other co-owner." Id. at 84. We remarked "how unedifying the Stewart/Mirza commercial-residential classification distinction is," stated it was "not workable," and rejected a case-by-case analysis. Id. at 92-100. Instead, we ruled the Supreme Court "had no intention to subsume small owner-occupied dwellings, such as two- or three-family homes, within the classification of commercial property," putting them in an exempt "category of their own." Id. at 99-100. However, the Supreme Court subsequently reaffirmed "the residential/commercial dichotomy," finding that, "although a handful of difficult cases have probed the gray area of the commercial/residential distinction, the framework continues to provide guidance and predictability for the overwhelming majority

33                                                                    A-1091-15T4

of property owners." Luchejko, 207 N.J. at 209-10 & n.6 (citing, e.g., Avallone, 252 N.J. Super. at 438).

In Grijalba, the defendant argued Smith "created a bright-line rule that all owner-occupied two- and three-family houses are considered 'residential' for purposes of sidewalk liability law." 431 N.J. Super. at 60. Emphasizing that Smith involved an "co-owner-occupied two-family house," Grijalba "agree[d] with the proposition expressed in Smith that typical owner-occupied two-family homes are generally in a category of their own and that an exploration of the predominant use of that type of property is usually unwarranted." Id. at 68-69.

However, we ruled Smith did not govern the treatment of three-family homes, and found it distinguishable because in Grijalba it was alleged "the property owner converted her two-family home into a basement-owner-occupied three-family home for business purposes." Id. at 69-70. We stated that "[t]he Stewart Court did not establish a bright-line rule for those anticipated difficult cases," and that "owner-occupied two- and three-family structures, have been analyzed, as expected, as they arise on a case-by-case, fact-sensitive basis." Id. at 71; see id. at 62, 67, 73-74. We remanded "[b]ecause there are unresolved and disputed factual issues regarding the nature of the ownership and the use of the

property," as well as its capacity to generate income and profit. Id. at 59, 72. We do the same here.

## VI.

Plaintiff also appeals the trial court's denial of the portion of his cross-motion for summary judgment which requested that defendant produce a copy of the policy or policies insuring the Building. The court denied the request because it violated Rule 4:24-2, which states: "Unless the court otherwise permits for good cause shown, motions to compel discovery and to impose or enforce sanctions for failure to provide discovery must be made returnable prior to the expiration of the discovery period." Plaintiff has failed to show good cause or an abuse of discretion.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1091-15T4